## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| COLONY INSURANCE COMPANY | Civil Action No. 20-cv-09446-JHR-JS |
| *Plaintiff*, |  |
| v. | **Opinion** |
| ASPEN SPECIALTY INSURANCE COMPANY; AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY; HOSPITALITY SUPPORTIVE SYSTEMS, LLC; DIVE BAR DIVA, LLC t/a THE ALIBI ROOM |  |
| *Defendants*. |  |

Defendant Aspen Specialty Insurance Company ("Aspen") issued an insurance policy to Defendant Hospitality Supportive Services, LLC ("HSS") stating that $1 million is "the most that [Aspen] will pay" to insure liquor liability claims (the "Aspen Policy"). In the motions for judgment on the pleadings presently before the Court, excess insurers Colony Insurance Company ("Colony") and American Guarantee and Liability Insurance Company ("AGLIC") ask the Court to declare that Aspen must insure more than $1 million in liquor liability claims. [Dkt. 43; Dkt. 46]. For the reasons set forth below, the Court declines to do so and will deny both motions.

### I.    Background

Colony, Aspen, and AGLIC issued insurance policies to HSS, an insurance purchasing group that administers a shared-risk insurance program for hospitality and restaurant industry businesses (the "Shared Risk Program"). [Dkt. 1, Compl. ¶ 21]. Approximately 205 businesses subscribe to and receive insurance coverage through the Shared Risk Program ("Subscribers").

1

[Dkt. 6 at 7].  For the period from June 13, 2015 to December 13, 2016, Aspen provided the primary insurance policy for the Shared Risk Program, Colony provided an excess insurance policy (the "Colony Policy"), and AGLIC provided a third policy excess to both the Aspen Policy and the Colony Policy (the "AGLIC Policy").  [Compl. ¶ 31; Dkt. 43-2 at 15 n.1].  Each policy requires the respective insurer to defend and indemnify Shared Risk Program participants in litigation concerning certain covered events.  [Compl. ¶¶ 24, 27, 32].  The Colony Policy states that Colony's coverage obligations kick in after "proper exhaustion of the limits of the underlying Aspen Policy."  [Compl. ¶ 31].  Likewise, AGLIC's obligations begin when the Colony Policy's limits are exhausted.  [*See* Dkt. 46-2 at 15].  The parties disagree on the Aspen Policy's coverage limits.

### a. The Aspen Policy

Three components of the Aspen Policy are relevant to the present dispute.  First is the "Commercial General Liability Declarations" and the "Commercial General Liability Coverage Form," which the Court will refer to collectively as the "Base Policy."  The Base Policy establishes a $1 million coverage limit for "each occurrence" and a $2 million "general aggregate" coverage limit for covered events.  [Dkt. 43-2 at 4].  The Base Policy's "Commercial General Liability Coverage Form" defines events and injuries to which the Base Policy's coverage limits apply.  Section I- Coverage A of the "Commercial General Liability Coverage Form" contains an exclusion which states

### 2. Exclusions
This insurance does not apply to:

\*\*\*

### c. Liquor Liability
"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

    **(1)**    Causing or contributing to the intoxication of any person;

    **(2)**    The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

    **(3)**    Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in:

    **(a)**    The supervision, hiring, employment, training or monitoring of others by that insured; or

    **(b)**    Providing or failing to provide transportation with respect to any person that may be under the influence of alcohol; if the "occurrence" which caused the "bodily injury" or "property damage", involved that which is described in Paragraph (1), (2) or (3) above.

("Liquor Exclusion").  [Dkt. 43-2 at 11].

    The other two relevant components are endorsements that amend the Base Policy.   The Liquor Liability Extension Endorsement ("Liquor Endorsement") amends the Base Policy's Liquor Exclusion specifically.  It states that the Liquor Exclusion "shall not apply to the extent of the coverage provided by this Endorsement."  [Dkt. 43-2 at 84].  It further states the following:

    <u>Additional Paragraph 1</u>.

    The Liquor General Aggregate Limit set forth in the Schedule of this Endorsement is the most we will pay under this policy for all damages because of all "bodily injury" and "property damage" included within the "liquor hazard" that is sustained by one or more persons or organizations.

    <u>Additional Paragraph 2</u>.

    Subject to Additional Paragraph 1. above, the Liquor Each Location Aggregate Limit set forth in the Schedule of this Endorsement is the most we will pay under this policy for all damages because of "bodily injury" and "property damage" included within the "liquor hazard" that is sustained by one or

more persons or organizations as the result of the selling, serving or furnishing of any alcoholic beverage(s) at a location to which this insurance applies.

Additional Paragraph 3.

Subject to Additional Paragraph 1. & 2. above, the Liquor Each Location Occurrence Limit set forth in the Schedule of this Endorsement is the most we will pay under this policy for damages because of "bodily injury" and "property damage" included within the "liquor hazard" at each location to which this insurance applies, that is sustained by one or more persons or organizations as the result of the selling, serving or furnishing of any alcoholic beverage(s) to any one person.

"Liquor hazard" means all "bodily injury" and "property damage" arising out of the selling, servicing or furnishing of any alcoholic beverage(s).

[Dkt. 43-2 at 84–85].  The Liquor Endorsement also contains the following schedule:

| SCHEDULE | |
|---|---|
| **LIQUOR EACH LOCATION OCCURRENCE LIMIT:** | **$1,000,000** |
| **LIQUOR EACH LOCATION AGGREGATE LIMIT:** | **$1,000,000** |
| **LIQUOR GENERAL AGGREGATE LIMIT:** | **$1,000,000 [sic]** |

**ALL OTHER TERMS, CONDITIONS, AND EXCLUSIONS REMAIN UNCHANGED.**

[*Id.*].

Finally, the "Designated Location(s) General Aggregate Limit" endorsement ("All Subscribers Aggregate") sets aggregate coverage limits for each Subscriber and for all Subscribers collectively.  It states

A. Limits of Insurance in the General Liability Declarations are amended to include the following Limit: Combined Total Aggregate Limit Cap: $10,000,000

B. For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section I- Coverage A … which can be

attributed only to operations at a single designated "location" shown in the Schedule above:

1. A separate Designated Location General Aggregate Limit applies to each designated "location", and such limit is equal to the amount of the General Aggregate Limit shown in the Declarations, provided that the Combined Total Aggregate Limit Cap is the most we will pay under this Coverage Part for the sum of all Limits of Insurance as set forth in SECTION III, regardless of the number of your designated "locations" shown above in the schedule.

….

[Dkt. 43-2 at 86]. The "Designated Locations" are defined by reference to "bordereaus on file with company." [*Id.*]. The parties agree that the bordereau is the list of Subscribers. [Dkt. 43-1 at 13; Dkt. 52 at 23]. The parties also agree that, under the All Subscribers Aggregate, Aspen must cover $10 million at most for all claims against all Subscribers, and up to $2 million in aggregate claims against each Subscriber.[1]

### b. The Underlying DBD Litigation and the Present Dispute

One Subscriber was Defendant Dive Bar Diva ("DBD") which owns and operates The Alibi Room, a bar located on the White Horse Pike in Waterford, New Jersey. [Compl ¶ 7]. Since October 17, 2019, DBD has been the defendant in a wrongful death and survival action in the New Jersey Superior Court (the "DBD Litigation"). [Compl. ¶ 13]. Plaintiff in the DBD Litigation is the surviving wife of a deceased Alibi Room patron. She alleges that, on February 19, 2016, Alibi Room staff served her husband past the point of intoxication, and that DBD's

---

[1] Paragraph B.1 states that the "separate Designated Location General Aggregate Limit" which applies to each Subscriber is "equal to the amount of the General Aggregate Limit shown in the Declarations." As noted above, the "General Aggregate Limit" in the "Commercial General Liability Declarations" is $2 million. Thus, the aggregate per-Subscriber limit is $2 million.

conduct caused her husband to crash his car in a fatal accident after leaving the Alibi Room. [Compl. ¶¶ 14–19].  Trial in the DBD Litigation commences on March 21, 2022.  [Dkt. 61].[2]

Pursuant to the Aspen Policy, Aspen has defended the DBD Litigation and claims against other Subscribers.  [*See* Compl. ¶¶ 38–39].  In an August 29, 2019 letter to Colony, Aspen advised that "the $1 million liquor liability aggregate limit of the Aspen Policy is nearing exhaustion in connection with various liquor liability claims throughout the HSS Program." [Dkt. 4, Compl. Exh. D].  Aspen advised Colony, HSS, and other insureds that they should begin to coordinate "further handling of the [DBD Litigation] and other pending liquor liability claims…."  [*Id.*].  Central to this matter is Aspen's position that it must only insure the first $1,000,000 in aggregate liquor liability claims against all 205 Subscribersf.

Colony responded by stating that the Aspen Policy requires Aspen to insure "each location" for the first $1,000,000 in liquor liability claims and must provide $10,000,000 in aggregate liquor liability coverage.  [Dkt. 4, Compl. Exh. F].  Aspen repeated its position in a November 18, 2019 response letter to Colony and indicated that "the coverage available under the Aspen Policy appears to be insufficient to fully cover the [DBD Litigation]."  [Dkt. 4, Compl. Exh. G].

Colony filed this lawsuit seeking, among other things, a declaration that Aspen must provide $1 million in liquor liability coverage for each Subscriber, and that this $1 million per-Subscriber limit applies to the DBD Litigation.  [Count I, Compl. ¶¶ 50–59].  On April 23, 2021, the Court denied Aspen's motion to dismiss Colony's complaint for lack of subject matter jurisdiction after rejecting Aspen's argument that the case is not ripe for adjudication.  [Dkt. 19,

---

[2] The parties' briefing indicates that trial would commence in October 2021, but Counsel later indicated that trial has been delayed until March 21, 2022.  [Dkt. 61].

20].  Colony then filed an amended complaint, adding HSS and AGLIC as parties after omitting

them from the original complaint.  [Dkt. 21].

On July 23, 2021, Colony filed the present Motion for Judgment on the Pleadings.

Colony seeks an order stating that the claims alleged in the DBD Litigation "are subject to a $1

Million limit under the Aspen Policy's General Commercial General Liability Coverage Part"

and that Colony "has no obligation to provide excess liability coverage" until the DBD Litigation

exhausts Aspen's $1 million in per-Subscriber liquor liability coverage.  [Dkt. 43-3].  In its

response and cross motion, AGLIC agrees that Aspen must provide $1 million in liquor liability

coverage in the DBD Litigation, but also argues that AGLIC has no coverage obligations until

Aspen's $1 million liquor liability coverage limit and Colony's $2 million coverage obligations

have been exhausted.  [Dkt. 46-2 at 14–18].  Aspen does not opine on Colony's or AGLIC's

coverage obligations but maintains that the Aspen Policy only requires Aspen to cover $1 million

in aggregate liquor liability claims against all Subscribers, which have been exhausted in part by

liquor liability claims against other Subscribers.  [Dkt. 52].

## II.    Legal Standard

"A motion for judgment on the pleadings under Rule 12(c) 'is analyzed under the same

standards that apply to a Rule 12(b)(6) motion.'"  *Wolfington v. Reconstructive Orthopaedic*

*Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019) (*Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d

128, 134 (3d Cir. 2010)). "A motion for judgment on the pleadings will be granted ... if, on the

basis of the pleadings, the movant is entitled to judgment as a matter of law."  *DiCarlo v. St.*

*Mary Hosp.*, 530 F.3d 255, 262 (3d Cir. 2008) (citing *Allah v. Brown*, 351 F. Supp. 2d 278, 280

(D.N.J. 2004)).  Under Rule 12(c) "'judgment will not be granted unless the movant clearly

establishes that no material issue of fact remains to be resolved and that [the movant] is entitled

to judgment as a matter of law.'" *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir. 2008) (quoting *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir. 1988)). "[The Court] must view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Id.*

## III.   Analysis

### a.   Choice of Law

Before reviewing the merits of Colony's motion and AGLIC's cross motion, the Court must conduct a choice-of-law analysis to determine which state's law applies to the present dispute. "A federal court exercising diversity jurisdiction is to apply the choice-of-law rules of the forum state." *Gen. Ceramics Inc. v. Firemen's Fund Ins. Cos.*, 66 F.3d 647, 652 (3d Cir. 1995) (citing *Shuder v. McDonald's Corp.*, 859 F.2d 266, 269 (3d Cir. 1988)). Here, the Court must apply New Jersey's choice-of-law rules. "New Jersey courts apply the two-pronged 'most significant relationship' test of the Restatement (Second) of Conflict of Laws." *Curtiss-Wright Corp. v. Rodney Hunt Co*., 1 F. Supp. 3d 277, 283 (D.N.J. 2014) (citing *P.V. v. Camp Jaycee*, 962 A.2d 453 (N.J. 2008)).

The first step in this two-part test "is to determine whether an actual conflict exists" between the law of the states with an interest in the case. *P.V.*, 962 A.2d at 460. "That is done by examining the substance of the potentially applicable laws to determine whether 'there is a distinction' between them." *Id.* (quoting *Lebegern v. Forman*, 471 F.3d 424, 430 (3d Cir. 2006)). "If there is no actual conflict, the analysis ends and the law of the forum state applies." *Curtiss-Wright Corp*, 1 F. Supp. 3d at 283 (citing *Rowe v. Hoffman–La Roche, Inc.*, 917 A.2d 767 (N.J. 2007)). If a conflict exists, step two requires courts to "determine which jurisdiction has the 'most significant relationship' to the claim." *Id.* (citing *P.V.*, 962 A.2d 453). New Jersey

courts apply the factors set forth in Sections 6[3] and 188[4] of the Restatement (Second) of Conflict of Laws to determine the most significant relationship.  *See Cont'l Ins. Co. v. Honeywell Int'l, Inc.*, 188 A.3d 297, 315 (N.J. 2018).  Section 193, which applies to "contracts of fire, surety or casualty insurance," is also relevant.[5]  *See Gilbert Spruance Co. v. Pa. Mfrs. Ass'n Ins. Co.*, 629 A.2d 885, 888 (N.J. 1993).

---

[3] Section 6 provides

> [T]he factors relevant to the choice of the applicable rule of law include

> (a)     the needs of the interstate and international systems,
> (b)     the relevant policies of the forum,
> (c)     the relevant policies of other interested states and the relative interests of
>          those states in the determination of the particular issue,
> (d)     the protection of justified expectations,
> (e)     the basic policies underlying the particular field of law,
> (f)     certainty, predictability and uniformity of result, and
> (g)     ease in the determination and application of the law to be applied.

[4] Section 188 applies where parties to a contract have "not made an effective choice of law" determination in the contract.  *Cont'l Ins. Co.*, 188 A.3d at 315.  Section 188 instructs courts to consider the following contacts when applying § 6 factors:

> (a)     The place of contracting,
> (b)     The place of negotiation of the contract,
> (c)     The place of performance,
> (d)     The location of the subject matter of the contract, and
> (e)     The domicil, residence, nationality, place of incorporation and place of business of the parties.

[5] Section 193 states

> The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

Colony and AGLIC agree that "two states that arguably have an interest in having their law applied to the interpretation of the Aspen Policy are New Jersey and Pennsylvania." [Dkt. 43-1 at 17; *see also* Dkt. 46-2 at 9]. Both argue that New Jersey law should govern because relevant New Jersey and Pennsylvania contract law do not conflict. [Dkt. 43-1 at 17; Dkt. 46-2 at 9].

Aspen argues that a choice-of-law analysis is premature because Aspen's contract with HSS implicates a "complex" web of relationships between HSS and the Shared Risk Program's 200+ members which are located in New Jersey, New York, Pennsylvania, and elsewhere. [Dkt. 52 at 16–17]. Aspen argues that discovery concerning these other Subscribers is required before the Court can determine which state has the most significant relationship to this litigation. [*Id.*]. Alternatively, Aspen argues that Pennsylvania has the most significant interest in this case and that Pennsylvania law should govern. [*Id.*].

The Court rejects Aspen's argument. Aspen does not identify an interested state whose contract law conflicts with New Jersey law, and therefore skips the first step of New Jersey's choice-of-law analysis altogether.[6] Instead, Aspen improperly analyzes Restatement factors

---

Comment B to § 193 states, in part

> The location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state. Situations where this cannot be done, and where the location of the risk has less significance, include … where the policy covers a group of risks that are scattered throughout two or more states.

[6] This omission is glaring because Aspen acknowledges that it maintains a "bordereau" of Subscribers as described in the Aspen Policy and acknowledges that these Subscribers reside in New Jersey, Pennsylvania, New York, and elsewhere. [Dkt. 52 at 23 n.5]. Despite having Subscriber locations available to it, Aspen does not explain why it could not locate an interested state whose contract law conflicts with New Jersey contract law.

10

relevant to a "most significant relationship" determination which are properly considered at step two of the analysis.  Because Aspen fails to affirmatively show an "actual conflict" exists, the Court cannot consider the state interest factors relevant step two of the conflict-of-law analysis. *Curtiss-Wright Corp.*, 1 F. Supp. 3d at 283 ("If there is no actual conflict, the analysis ends and the law of the forum state applies.").

Similarly, Aspen has not identified a single point of law that varies from state to state that could affect the outcome of the present issue.  Aspen does not dispute that the Court's task here is to determine Aspen's coverage obligations by interpreting the Aspen Policy's plain language. This is a straight-forward contract interpretation issue based on the parties' intent "as manifested by the terms used in the written insurance policy." *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286 (Pa. 2007) (citing *401 Fourth Street, Inc. v. Investors Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005)); *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92 (3d Cir. 2001) (observing that it is "'firmly settled'" that "'the intent of the parties to a written contract is contained in the writing itself.'" (quoting *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993))).[7]  The Court need not consider nuanced legal rules or exceptions adopted in some states but not others.  *Cf. Pfizer, Inc. v. Emps. Ins. of Wausau*, 712 A.2d 634, 640 (N.J. 1998) (explaining how state-specific interpretations of "sudden and accidental" exceptions to pollution exclusion clauses in insurance contracts created a conflict of law issue).  The Court will not delay consideration of the present dispute based on the mere possibility that a Subscriber resides in a state that does not apply "firmly settled" contract interpretation principles.[8]  *See Pfizer*, 879

---

[7] *See also Crawford v. New Jersey Transit Employee's Ret. Plan*, No. A-4855-09T3, 2011 WL 1675090, at *3 (N.J. Super. Ct. App. Div. May 5, 2011); *Pacifico v. Pacifico*, 920 A.2d 73, 77 (N.J. 2007); *First Montauk Sec. Corp. v. Menter*, 26 F. Supp. 2d 688, 689 (S.D.N.Y. 1998).

[8] It is worth noting that DBD is the only Subscriber party to this litigation.  Aspen has not cited a case stating that, at step one of the choice-of-law analysis, courts must consider potential

A.2d at 640–41 (acknowledging that potentially interested states in an insurance dispute concerning toxic waste included New Jersey, New York, and "the states where the waste has come home to rest" and acknowledging conflict between relevant New Jersey and New York law, but conducting choice-of-law analysis based on New Jersey and New York law alone after observing that "[a]lthough there are variations on these views, we may assume that the laws of the waste sites will be similar to either New York law or New Jersey law.").

The contract law of New Jersey, Pennsylvania, and New York—which Aspen has cited as states where Shared Risk Programs reside—support the Court's approach.  The law of each of these states requires courts to interpret insurance contracts by focusing on their plain language, as with any other contract.  *Porco v. Lexington Ins. Co.*, 679 F. Supp. 2d 432, 435 (S.D.N.Y. 2009) ("Insurance policies are, in essence, creatures of contract, and accordingly, subject to principles of contractual interpretation.") (quoting *In re Covert*, 761 N.E.2d 571, 576 (N.Y. 2001))); *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008) ("In attempting to discern the meaning of a provision in an insurance contract, the plain language is ordinarily the most direct route." (citing *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262 (N.J. 2001))); *Donegal Mut. Ins. Co.*, 938 A.2d 286.  *See also Walters v. Am. Home Assur.*, No. CIV.A. 09-4637 FLW, 2011 WL 4409170, at *12 (D.N.J. Sept. 21, 2011) ("Thus, there is no actual conflict regarding how [New Jersey and Pennsylvania] interpret[] policies.").

Aspen also directs the Court to ongoing litigation between Aspen and HSS in the Eastern District of Pennsylvania where Judge DuBois recently declined to rule on a choice-of-law issue concerning Aspen's contracts with HSS on a motion for partial summary judgment.  [Dkt. 52 at

---

conflicts with the law of states where non-parties with a remote interest in the outcome of the litigation reside.  The Court is not aware of any such case.

16]; *Aspen Specialty Ins. Co. v. Hosp. Supportive Sys., LLC*, No. CV 16-1133, 2021 WL

3403416 (E.D. Pa. Aug. 3, 2021).  According to Aspen, Judge DuBois declined to rule on the

issue in part because the record was too sparse to decide the choice-of-law issue.  [Dkt. 52 at 16].

Aspen argues that the Court here should follow Judge DuBois's approach.

Aspen's argument is specious.  First, the summary judgment motions at issue in that case

concerned whether Aspen was legally required to notify "additional named insured" parties of

Aspen's intent to cancel its coverage to HSS.  *Aspen*, 2021 WL 3403416 at *1.  They did not

involve an interpretation of the Aspen Policy or Aspen's coverage requirements as outlined in

that policy.  Second, Judge DuBois had granted leave to file summary judgment motions on this

single issue based an assumed agreement among the parties that Pennsylvania law would govern

the inquiry.  *Id.* at *4.  Judge DuBois declined to consider the choice-of-law issues because they

exceeded the scope of his order.  Third, and most importantly, Aspen argued that Pennsylvania

law should apply in that case.  *Id.* at *3 ("Aspen argues that … Pennsylvania law applies to the

cancellation of all policies….").

Ultimately, "'[a] court has to make a choice of law decision in an actual case only …

when the laws of the involved states differ on the point in issue.'"  *Pfizer*, 712 A.2d at 640

(quoting Robert A. Sedler, *A Real World Perspective on Choice of Law*, 48 Mercer L. Rev. 781,

783 (1997)).  Because Aspen has not shown that such a conflict exists, and because no conflict

exists between New Jersey law and the contract law of New Jersey or New York, the Court will

apply New Jersey law to the present dispute.

### b.  Contract Interpretation

As noted above, the present dispute concerns Aspen's liquor liability coverage

obligations under the Aspen Policy.  Colony and AGLIC argue that the Liquor Endorsement and

the All Subscribers Aggregate provisions of the Aspen Policy require Aspen to insure up to $1 million in liquor liability claims for each Subscriber, including DBD.  Aspen disagrees.

Resolving this dispute requires the Court to interpret the Aspen Policy.  "Contract interpretation is a question of law" for courts.  *Hess Corp. v. ENI Petroleum US, LLC*, 86 A.3d 723, 727 (N.J. Super. Ct. App. Div. 2014) (citing *Selective Ins. Co. of Am. v. Hudson E. Pain Mgmt. Osteopathic Med. & Physical Therapy*, 46 A.3d 1272 (N.J. 2012)).  When interpreting an insurance contract, like any other contract, "courts first look to the plain meaning of the language at issue."  *Oxford Realty Grp. Cedar v. Travelers Excess & Surplus Lines Co.*, 229 N.J. 196, 207, 160 A.3d 1263, 1270 (2017) (citing *Chubb Custom Ins. Co.*, 948 A.2d 1285).  "If the language is clear, that is the end of the inquiry."  *Chubb Custom Ins. Co.*, 948 A.2d at 1289 (citing *Zacarias*, 775 A.2d 1262).  Language in an insurance contract is "clear," and therefore not ambiguous, unless "'the phrasing of the policy is so confusing the average policy holder cannot make out the boundaries of the coverage.'"  *Pennbarr Corp. v. Ins. Co. of N. Am.*, 976 F.2d 145, 151 (3d Cir. 1992) (quoting *Am. White Cross Lab., Inc. v. Continental Ins. Co.*, 495 A.2d 152, 157 (N.J. Super. Ct. App. Div. 1985)).  Courts must strive "to give effect to the whole policy, not just one part of it.  A construction that gives reasonable meaning to all of the contract's provisions is preferred to one which leaves a portion of the writing useless or inexplicable."  *Id.* (citations and quotations omitted).

### i.  Liquor Endorsement

Colony and AGLIC argue that the Liquor Endorsement's $1 million "liquor each location occurrence" limit and $1 million "liquor each location aggregate" limit require Aspen to provide $1 million worth of coverage in the DBD Litigation.[9]  [Dkt. 43-1 at 21–22; Dkt. 46-2 at 13–14].

Aspen argues that Colony and AGLIC improperly ignore the Liquor Endorsement's third limit, namely, the $1 million "liquor general aggregate limit."  [Dkt. 52 at 24–25].  According to Aspen, the "liquor general aggregate limit" sets a $1 million **total** coverage limit for all liquor claims against any and all Subscribers.  Aspen maintains that other Subscribers incurred liquor liability which exhausted some of the $1 million in aggregate coverage available to all Subscribers and, therefore, to DBD.  [*Id.* at 29].  Aspen emphasizes that this arrangement is part and parcel "shared risk" that HSS's clients undertake when they join the Shared Risk Program.  [*Id.*].

The Liquor Endorsement is comprised of three "Additional Paragraphs" and a coverage limit schedule.  Additional Paragraph 1 of the Liquor Endorsement states that the $1 million "liquor general aggregate limit" listed in the coverage limit schedule "**is the most we will pay under this policy for all damages** … included within the 'liquor hazard' that is **sustained by one or more persons or organizations**."  [Dkt. 43-2 at 84] (emphasis added).  By its plain meaning, Additional Paragraph 1 establishes a maximum amount of coverage that Aspen may have to provide for "all damages … included within the 'liquor hazard'" because it states that $1 million is "the most" that Aspen will pay.  *Most*, Merriam-Webster, https://www.merriam-webster.com/dictionary/at%20most ("the greatest amount;" "an extreme limit").  In other words, "the most" that Aspen must pay for "all" liquor liability claims is $1 million.

---

[9] To be clear, there is no dispute that the injuries alleged in and costs associated with the DBD Litigation qualify as insurable "liquor hazards" under the Liquor Endorsement.  The parties only dispute the amount of liquor liability coverage available under the Aspen Policy.

The remaining paragraphs in the Liquor Endorsement are equally clear that the $1 million "liquor general aggregate limit" set forth in Additional Paragraph 1 caps the liquor coverage available to each Subscriber and for each occurrence.  Additional Paragraph 2 of the Liquor Endorsement states that the $1 million "liquor each location aggregate limit" listed in the coverage limit schedule is "**the most** we will pay under this policy for all damages … included within the 'liquor hazard' **at each location to which this insurance applies**…."  [Dkt. 43-2 at 85] (emphasis added).  By its plain meaning, Additional Paragraph 2 establishes a maximum amount of liquor liability coverage that Aspen may have to provide for each Subscriber because it states that $1 million is "the most" that Aspen will pay for "liquor hazards" at any single location.  *Most*, Merriam-Webster, https://www.merriam-webster.com/dictionary/at%20most ("the greatest amount;" "an extreme limit").

However, Additional Paragraph 2 does not guarantee $1 million in liquor coverage to each Subscriber or establish a per-Subscriber liquor coverage minimum.  Instead, Additional Paragraph 2 states that the $1 million per-Subscriber limit is "subject to" the $1 million "liquor general aggregate limit" set forth in Additional Paragraph 1.  The dictionary definition and ordinary meaning of "subject to" is "affected by or possibly affected by."  *Subject To*, Merriam-Webster, https://www.merriam-webster.com/dictionary/subject%20to.  *See also Mildenhall, LLC v. Higginbotham*, 83 Va. Cir. 256 (2011) (interpreting "subject to" to mean "contingent upon").  Thus, Additional Paragraph 2 plainly acknowledges that the $1 million maximum liquor coverage available to **each** Subscriber is "subject to" and may be "affected by" the $1 million maximum available to **all** Subscribers in the aggregate.  Though the Liquor Endorsement does not say so explicitly, liquor claims against one Subscriber necessarily reduce the amount of

liquor liability coverage available to that Subscriber and to all other Subscribers.[10]  This

interpretations gives logical and "reasonable meaning" to the "the most" language in Additional

Paragraphs 1 and 2, and the "each location" and "subject to" language in Additional Paragraph 2.

*Pennbarr Corp.*, 976 F.2d at 151 (citations and quotations omitted).

Additional Paragraph 3 of the Liquor Endorsement extends this logical relationship to

individual liquor hazard occurrences.  Additional Paragraph 3 states that the $1 million "liquor

each location occurrence limit" "is the **most** we will pay under this policy for damages …

included within the 'liquor hazard' at each location to which this insurance applies … as the

result of the selling, serving or furnishing of any alcoholic beverage(s) to any one person."  [Dkt.

43-2 at 85].  As with Additional Paragraph 2, Additional Paragraph 3, sets a $1 million per-

occurrence coverage maximum, but does not guarantee $1 million in per-occurrence coverage.

Additional Paragraph 3 further states that this "each location occurrence limit" is "[s]ubject to

Additional Paragraphs 1. & 2. above."  As in Additional Paragraph 2, this "subject to" language

means that the $1 million maximum coverage available per occurrence may be affected by the $1

million per-Subscriber and $1 million aggregate limits.  Thus, if a single Subscriber incurs

liability through multiple "occurrences," the coverage provided in earlier occurrences will reduce

the amount of coverage available to that same Subscriber under Additional Paragraph 2 and all

other Subscribers in the aggregate under Additional Paragraph 1.[11]  Likewise, a Subscriber will

---

[10] For example, assume Bar A and Bar B are the only Subscribers under the same terms
discussed above.  On day 1 of the policy coverage period, Bar A incurs $100,000 in liquor
liability.  Aspen covers the event.  Because Bar B's $1 million per-location liquor limit is
"subject to" the $1 million aggregate liquor limit, only $900,000 of liquor liability coverage is
available to Bar B.  The contract's plain language requires this result even though Bar B did not
itself exhaust any aggregate or per-location coverage.

[11] For example, Bar A incurs $100,000 in liquor liability in Occurrence 1 and $100,000 in liquor
liability in Occurrence 2.  Occurrence 3 occurs which will result in liquor liability to Bar A.

have less than $1 million available in per-occurrence coverage if that same Subscriber or any other Subscriber previously incurred liquor liability.

As this analysis demonstrates, the Court agrees with Aspen that the Liquor Endorsement only requires Aspen to provide $1 million in total liquor liability coverage, and that liquor liability costs incurred by one Subscriber erode the amount of liquor liability coverage available to all other Subscribers.

Colony and AGLIC resist this interpretation.  They argue that the $1 million "liquor general aggregate limit" set forth in Additional Paragraph 1 of the Liquor Endorsement does not limit the "liquor each location" or "liquor each location occurrence" limits set forth in Additional Paragraphs 2 and 3, respectively.  [Dkt. 43-2 at 21–24; Dkt. 46-2 at 12–14].  They argue that Aspen's interpretation deprives the $1 million "each location" and "each location occurrence" liquor liability limits of their plain meaning.

The Court disagrees.  The "subject to" language in Paragraphs 2 and 3 expressly qualifies the liquor liability coverage available to "each location" and for "each occurrence."  This language clarifies that the per-Subscriber and per-occurrence limits are "subject to" the $1 million is total liquor coverage available to all Subscribers in the aggregate.  While it may be counterintuitive that $1 million per-occurrence and per-subscriber limits do not guarantee $1 million in liquor liability coverage to each Subscriber or for each event, Liquor Endorsement's plain language requires this interpretation.  To find otherwise would strip the "subject to" language in Additional Paragraphs 2 and 3 of its effect.  *See Penbarr Corp.*, 976 F.2d at 151

---

Only $800,000 in coverage is available to Bar A for Occurrence 3—despite the $1 million per-occurrence limit—because Occurrences 1 and 2 reduced the per-location and aggregate liquor coverage available.  Likewise, after Occurrences 1 and 2, only $800,000 in liquor coverage is available to Bar B for a single occurrence or multiple occurrences.

("[I]t is [the court's] responsibility to give effect to the whole policy, not just one part of it." (citations and quotations omitted)).

Colony and AGLIC also argue that only the $10 million general aggregate limit created by the All Subscribers Aggregate restricts the amount of liquor liability coverage that Aspen must provide for all Subscribers in the aggregate.  [Dkt. 54 at 12; 46-2 at 14].  Under this interpretation, ten Subscribers could incur $1 million each in liquor liability and exhaust all coverage available under the Aspen Policy.  Likewise, a single Subscriber could incur $1 million of liquor liability in each of ten occurrences and exhaust Aspen's coverage.

This interpretation violates a black-letter principle of contract interpretation.  Additional Paragraph 1 states that $1 million "is the most we will pay under this policy for all damages … included within the 'liquor hazard'…." [Dkt. 43-2 at 84], and Additional Paraphs 2 and 3 state that the $1 million per-Subscriber and per-occurrence liquor limits are "subject to" this $1 million aggregate limit.  Colony and AGLIC's position would invalidate the "the most" language in Additional Paragraph 1's by requiring Aspen to cover more than $1 million in total liquor liability claims.  It would also invalidate the "subject to" language in Additional Paragraphs 2 and 3 by releasing per-Subscriber and per-occurrence liquor limits from the $1 million aggregate limit.  But contract law requires the Court to interpret contracts "'to give meaning to all [their] terms.'"  *In re Energy Future Holdings Corp.*, 842 F.3d 247, 256 (3d Cir. 2016) (quoting *Barrow v. Lawrence United Corp.*, N.Y.S.2d 363 (N.Y. App. Div. 1989)); *accord Com. ex rel. Kane v. UPMC*, 129 A.3d 441, 464 (Pa. 2015) ("[A] contract must be interpreted to give effect to all of its provisions.  Thus, our Court will not interpret one provision of a contract in a manner which results in another portion being annulled." (citations and quotations omitted)); *Heffron v. Adamar of New Jersey, Inc.*, 270 F. Supp. 2d 562, 572 (D.N.J. 2003) ("[A]n interpretation [of an

agreement] which gives reasonable ... and effective meaning to all [of its] terms is preferred to an interpretation which leaves a part unreasonable ... or of no effect." (quoting Restatement (Second) of Contracts, § 203(a))).  This principle compels the Court to reject Colony and AGLIC's suggestion that Additional Paragraphs 2 and 3 guarantee $1 million in liquor liability coverage to each Subscriber and for each occurrence, subject only to the All Subscriber Aggregate's $10 million cap on all liability claims.

### ii.  All Subscribers Aggregate

Colony and AGLIC also argue that Aspen's interpretation of Liquor Endorsement conflicts with the All Subscribers Aggregate, which establishes a $2 million aggregate coverage limit for all claims against each Subscriber, and a $10 million aggregate limit for all claims against all Subscribers.  They argue that Aspen cannot square its proposed $1 million aggregate liquor liability with its $2 million aggregate per-Subscriber coverage obligations.  [Dkt. 43-1 at 23–27].  The Court disagrees and finds that the limits established in the All Subscribers Aggregate harmonize with the limits set forth in the Liquor Endorsement.

Although the parties agree that the All Subscribers Aggregate establishes a $2 million per-Subscriber aggregate coverage limit and a $10 million coverage limit for all claims against all Subscribers, the Court must parse this endorsement's language to demonstrate how it comports with the Liquor Endorsement.  The All Subscribers Aggregate amends the Base Policy to include a $10 million "Combined Total Aggregate Limit Cap."  [Dkt. 43-2 at 86].  Paragraph B of the All Subscribers Aggregate states that

> For all sums which the insured becomes legally obligated to pay as damages caused by "occurrences" under Section I – Coverage A …. A separate Designated Location General Aggregate Limit applies to each designated "location", and such limit is equal to the amount of the General Aggregate Limit shown in the Declarations, provided that the [$10 million] Total Aggregate Limit Cap is the

> most we will pay under this Coverage Part for the sum of all
> Limits of Insurance….

[Dkt. 43-2 at 86].[12]

Critically, Paragraph B applies to liability incurred under "Section I – Coverage A" of the Base Policy.  Section I – Coverage A contains the Liquor Exclusion which, again, states that "[t]his insurance does not apply to … Liquor Liability."  [Dkt. 43-2 at 11].  The All Subscribers Aggregate does not explicitly refer to or modify the Liquor Exclusion.  Nor does it expressly state that it applies to liquor liability claims.  Thus, the only way that the $2 million "Designated Location General Aggregate Limit" could apply to liquor hazard claims at all is through the Liquor Endorsement, which provides the sole basis for liquor hazard coverage in the Aspen Policy by amending the Liquor Exclusion.  But, as discussed above, the Liquor Endorsement states that $1 million is "the most" that Aspen will pay for all liquor hazard claims against all Subscribers.  Reading the All Locations Aggregate and Liquor Endorsement together, each Subscriber has a $2 million aggregate coverage limit and may exhaust up to $1 million of this aggregate through liquor hazard claims, but liquor hazard claims against any Subscriber will erode the amount of liquor liability coverage available.  Aspen supports this interpretation.  [*See* Dkt. 52 at 26–27].

Colony's disagreement with this reading of the All Subscribers Aggregate relies on an unreasonable interpretation of the term "separate" in Paragraph B.  Colony argues that, under Paragraph B, "each [Subscriber] has a ***separate*** [$2 million] general aggregate limit … that cannot be eroded or exhausted by payments for the liquor liabilities of other insureds at other locations."  [Dkt. 43-1 at 26 (emphasis in original)].  On this interpretation, the word "separate"

---

[12] The "General Aggregate Limit shown in the Declarations" is $2 million, so Paragraph B establishes a $2 million "Designated Location General Aggregate Limit" for each Subscriber.

in Paragraph B creates a $2 million per-Subscriber coverage limit "separate" and apart from the $1 million aggregate liquor liability limit set forth in the Liquor Endorsement, but which applies to liquor liability claims.  The Base Policy's $1 million general per-occurrence limit would then require Aspen to cover $1 million in the DBD Litigation.

Colony's interpretation of the word "separate" invents a basis for liquor hazard coverage where none exists in the contract's plain language.  The All Subscribers Aggregate does not define the scope of coverage or list covered events "separate" from the Base Policy.  Neither Part B nor any other language in the All Subscribers Aggregate provides a "separate" contractual basis for liquor liability coverage.  Instead, the All Subscribers Aggregate refers explicitly to "Section I – Coverage A," which only covers liquor liability because of the Liquor Endorsement. The Liquor Endorsement "modifies" the Base Policy's Liquor Exclusion to include liquor hazard coverage, but only "to the extent of the coverage provided by this Endorsement."  [Dkt. 43-2 at 84].  The Liquor Endorsement includes a $1 million aggregate liquor liability limit for all claims against all Subscribers, which Paragraph B does not modify.

Thus, whether Colony interprets "separate" to mean that Paragraph B provides an independent basis for $1 million per-Subscriber liquor liability, or to sidestep the Liquor Endorsement's $1 million aggregate liquor limit, its interpretation finds no support in the Aspen Policy's plain language.  The Court cannot rewrite the All Subscribers Aggregate to require Aspen to exceed the Liquor Endorsement's $1 million aggregate liquor liability limit.  *Kieffer v. Best Buy*, 14 A.3d 737, 743 (N.J. 2011) ("The judicial task is simply interpretative; it is not to rewrite a contract for the parties better than or different from the one they wrote for themselves." (citations omitted)); *see also Pennbarr Corp.* 976 F.2d at 151 ("A construction that gives reasonable meaning to all of the contract's provisions is 'preferred to one which leaves a portion

of the writing useless or inexplicable.'" (quoting *Caruso v. John Hancock Mut. Life Ins. Co.*, 57 A.2d 359, 360 (N.J. Ct. App. 1948)).

### iii.  Ambiguity

Finally, Colony argues that "to the extent that Aspen intended to provide liquor liability coverage with a single $1 Million limit to be shared jointly by more than 205 insureds on a 'first come, first served' basis, the onus was on Aspen to draft a policy that clearly communicated that intent."  [Dkt. 43-2 at 24].  Similarly, Colony and AGLIC argue that, at best, the Aspen Policy is ambiguous with respect to Aspen's liquor liability coverage obligations.  [Dkt. 43-1 at 23–24]; Dkt. 46-2 at 14].  They argue that any uncertainty must be resolved in favor of coverage.  [Dkt. 43-2 at 24; Dkt. 46-2 at 14].

The Court agrees that piecing together the Aspen Policy's various coverage limits and endorsements is no simple task.  But "[a]n insurance policy … is not ambiguous merely because it is complex."  *Pennbarr Corp.*, 976 F.2d at 151 (citing *Transamerica Ins. Co. v. Keown*, 451 F. Supp 397, 400 (D.N.J.1978)); *accord Sayles v. G & G Hotels, Inc.*, 57 A.3d 1129, 1134 (N.J. Super. Ct. App. Div. 2013) ("The general principle that ambiguous contractual … agreements should be construed against [one party] does not require a search for ambiguity in every complex provision.").  The pieces ultimately come together to form a coherent whole that clearly establishes a $1 million aggregate liquor hazard limit, a limit which caps Aspen's per-occurrence and per-Subscriber liquor hazard coverage obligations and qualifies Aspen's $2 million per-Subscriber aggregate coverage obligations.  Consequently, the Court declines to "'engage in a strained construction to support the imposition of liability' or write a better policy" for HSS, Colony, or AGLIC's benefit.  *Oxford Realty Grp. Cedar*, 160 A.3d at 1270 (quoting *Chubb Custom Ins. Co.*, 948 A.2d 1285).

23

Moreover, AGLIC and Colony are incorrect that the Court must resolve any doubt in favor of coverage in this case.  "Ordinarily, our courts construe insurance contract ambiguities in favor of the insured…  Sophisticated commercial insureds, however, do not receive the benefit of having contractual ambiguities construed against the insurer."  *Oxford Realty Grp. Cedar*, 160 A.3d at 1270–71 (citations and quotations omitted)).  AGLIC and Colony are not "insureds" under the Aspen Policy and are therefore not entitled to deference.  Moreover, HSS, as the administrator of a complex and pooled interstate insurance program, undoubtedly qualifies as a "sophisticated commercial insured" that is not entitled to benefit from any ambiguity.

Ultimately, the Court agrees with Aspen that the Aspen Policy only requires Aspen to provide $1 million in aggregate coverage for all "liquor hazard" claims against all Subscribers. The Court also agrees that the amount of liquor hazard coverage that Aspen must provide in the DBD Litigation depends on the amount of liquor hazard coverage exhausted through claims against other Subscribers.  At this juncture, it is unclear how much of the $1 million in aggregate liquor liability coverage remains for the policy period at issue, or if liquor hazard claims other than the DBD Litigation may deplete the policy limits.  Thus, the Court will not decide the amount of coverage that Aspen must provide in the DBD Litigation.

### c.   Aspen's Reformation Argument

Aspen argues that "significant issues of reformation [would] arise" if the Court agrees with Colony's and AGLIC's interpretation of the Aspen Policy and finds that Aspen must provide up to $1 in million liquor liability coverage in the DBD Litigation.  [Dkt. 52 at 30].  In the event of an adverse ruling, Aspen argues that it is entitled to discovery to investigate these reformation issues.  [*Id.* at 35].  However, because the Court agrees with Aspen's interpretation of the Aspen Policy, the Court need not consider this issue.

### d.  Colony's and AGLIC's Requests for Relief

Colony and AGLIC have asked the Court to decide when their respective coverage obligations begin under the Colony Policy and the AGLIC Policy, respectively.[13]  However, both requests generally assume that Aspen must pay $1 million in coverage in the DBD litigation, and the parties' briefing on the Colony and AGLIC Policies is minimal.  Colony only analyzes the Aspen Policy.  AGLIC only briefly addresses its own policy and does not analyze the Colony Policy.  [Dkt. 46-2 at 15–18].  The Court will therefore limit its ruling to the Aspen Policy and declines to determine Colony's and AGLIC's coverage obligations until those issues have been fully briefed.

## IV.    Conclusion

For the reasons discussed above, the Court will deny Colony's Motion for Judgment on the Pleadings and AGLIC's Cross-Motion for Judgment on the Pleadings.  An appropriate order will follow.


September 30, 2021                                        /s/ Joseph H. Rodriguez

                                                      Joseph H. Rodriguez, USDJ

---

[13] For example, Colony asks the Court to find that "Colony has no obligation to provide excess liability coverage, if at all, unless and until the $1 Million limits of the Aspen Policy have been exhausted by payments in connection with claims asserted against DBD."  [Dkt. 43-1 at 22].

25